UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALTAGRACIA SALCEDO,

Plaintiff,

Case No. 2:24-cv-01141-KCD-NPM

v.

THE DISTRICT BOARD OF TRUSTEES SOUTHWESTERN STATE COLLEGE, FLORIDA, THE DISTRICT BOARD OF TRUSTEES FOR FLORIDA SOUTHWESTERN STATE COLLEGE,

Defendants.
_______________________________/

**ORDER**

Plaintiff Altagarcia Salcedo sues her former employer, Defendant Florida Southwestern State College ("FSW"), for discrimination and retaliation. (*See* Doc. 6.) FSW moved for summary judgment (Doc. 28), and Salcedo has responded (Doc. 36), making this matter ripe. For the reasons below, the motion is **GRANTED**.

## I. Background

The parties largely agree on the basic plot of this dispute, even if they fiercely contest the underlying motives. Where the record reveals a genuine dispute over the facts, the Court notes it below. Salcedo, a 49-year-old Hispanic woman with brown skin, was an associate director in the student affairs

department at FSW. She worked there for a tumultuous year before she was fired.

During that year, her relationship with other employees was strained. Especially in the IT department. She claims that two IT employees, Kaci Brito and Carmen Allen, often ignored her when visiting the building but greeted white colleagues. (Doc. 36 at 10.) They also required Salcedo to "submit HTML code with IT tickets," a requirement they did not impose on her younger, white colleagues. (*Id.*)

Worse, Brito allegedly refused to train Salcedo. On one occasion, Brito held back assignments until the eleventh hour, forcing Salcedo to miss an afternoon of training just to get the work done. (*Id.* at 11.) And during a separate virtual training session, Brito unceremoniously invited Salcedo to drop off the call right as the presentation turned to topics relevant to her job. According to the transcript, their conversation went like this:

> Brito: "…and also you can jump off at any point because we just needed communication stuff."
>
> Salcedo: "I don't mind staying, because I know it affects admissions, so I'd like to be able to give them a recap…"
>
> Brito: "Cool."

(Doc. 36-1 at 204.)

Then came the system audit. FSW says it reviewed its network to comply with federal cybersecurity standards, identifying employees who held more system access than their roles strictly required. As a result of that audit, Salcedo and two of her coworkers lost their prior access. (Doc. 27-3 at 6.) But Salcedo views the lock-out as a targeted attack. She points out that the vice president of IT never bothered to ask her—or her supervisor—what level of access her duties actually required. In her mind, the real goal was simply to make her job impossible. (Doc. 36 at 10.)

The aftermath only fueled her suspicions. According to Salcedo, FSW revised her job description to reflect the fact that she would not be able to access the software system. Yet it did not remove the clause requiring her to continue training other employees on its use. (Doc. 36-1 at 496.)

At that point, Salcedo formally complained of discrimination to HR. (Doc. 36-3 at 1.) But the ensuing investigation brought her no relief. The inquiry concluded that no discrimination had occurred. (Doc. 36-4 at 12.) Five months later, a flurry of emails culminated in Salcedo's termination. The messages are reproduced below. The back-and-forth is undeniably long, but it provides necessary context to understanding how and why FSW showed her the door. Salcedo first emailed her direct supervisor, Kailee Mateika:

> From: Altagracia Salcedo
> Sent: Wednesday, September 6, 2023 9:02 AM
> To: Kailee Mateika

Subject: Tomorrow's Meeting

Good morning, Kailee. I hope this message finds you well. I would like to discuss some concerns I have regarding recent events, and I have outlined them below for our meeting tomorrow:

1. Survey Assignment: I was responsible for distributing surveys to the team, following your approval of my recommended approach, which was to assign two surveys to each team member to prevent them from feeling overwhelmed with eight surveys.

2. Tiffany's Request: Tiffany repeatedly asked to have alt eight surveys on each iPad, contrary to the approved plan. Despite my explanation and insistence that we stick to the agreed-upon approach on three separate occasions, she continued to request this change, and it was eventually granted by you during Tuesday's meeting. She refused to accept the direction I gave her, which is insubordination. Could you please provide an explanation for why Tiffany's actions consistently undermine my work that has been previously approved by you?

3. Consistent Behavior: This incident is not an isolated case. Tiffany has also displayed disrespectful behavior towards me in front of the team and during meetings. Could you please provide insights into why Tiffany' s actions and behavior have been allowed to persist without intervention as they are impacting our work environment negatively?

4. Disparaging Remarks: Tiffany has been allowed to make disparaging remarks about former colleagues, Susel, Raquel and Yuri, during team meetings, falsely accusing them of subpar work and maliciously deleting files. Such behavior is detrimental to our work environment.

5. Negative Comments about Naples School District: Tiffany's negative comments about people coming with "pitchforks" for the Naples school board members for not canceling school during the first day of the hurricane are unprofessional and alarming. Negative comments like that about people we should be building relationships and

partnerships with are inappropriate and counterproductive. It's essential that we maintain a positive and professional relationship with the community.

Could you please provide insights into why Tiffany's actions and behavior have been allowed to persist without intervention? As you are in charge of the team, it is your responsibility to manage and coach her in the moment to prevent these issues from continuing. If she displays insubordination again and undermines the work that I have completed and you have approved, I may have no choice but to bring these concerns to Jason's attention.

Given the recent instance where Tiffany made last-minute changes to my approved work, and has a tendency to undermine not only my work but those of her own colleagues, I would like to request the following procedures moving forward: I will need assigned tasks to come with either a soft or hard deadline in writing, and approvals for such tasks should also be documented in writing.
Thank you for your attention to these concerns.

* * * *

From: Kailee Mateika
Sent: Wednesday, September 6, 2023 4:01 PM
To: Altagracia Salcedo
Subject: Re: Tomorrow's Meeting

Altagracia,

Our team is a collaborative, creative, and flexible group. Plans can change as situations evolve and change or as we move through a project. As the leader of this team, it is my prerogative to make adjustments to move things forward. Tiffany does not report to you. She reports to me. Therefore, the only way she could be deemed insubordinate is if she refused a reasonable request from me as her supervisor. It is not helpful or productive for you to view anyone as "undermining your work" when I make a decision. I have been in these meetings and have not viewed any team members treating you or anyone else in a disrespectful manner. I have not received any complaints regarding Tiffany's work. Regarding the discussion of

> Collier County Public Schools, the conversation was not disparaging, it reflected the observations of the team regarding the reaction of parents.
>
> Regarding your request, "I will need assigned tasks to come with either a soft or hard deadline in writing, and approvals for such tasks should also be documented in writing." I am not going to accommodate that request and instead would strongly urge you to Learn to be more flexible and less rigid as you participate within this team environment going forward.

(Doc. 36-9.) Apparently unhappy with Kailee's response, Salcedo emailed FSW's President:

> From: Altagracia Salcedo
> Sent: Wednesday, September 6, 2023 5:47 PM
> To: Jeffery S. Allbritten
> Cc: Ian Neuhard
> Subject: Fw: Tomorrow's Meeting
>
> Dear President Allbritten,
>
> I hope this message finds well. I came to FSW to help the organization and serve the students. For the most part I love it here and like you I believe in integrity. I don't believe employees should be allowed to speak ill of others in meetings, especially when it comes to our community partners. I addressed these concerns and others to Kailee and received the following email. I have been treated unfairly at FSW simply for asking for clarity and respect and this is not first time.
>
> Although it was not my job, I reached out to the CEO of the Marriott and Publix for donations after hurricane Ian, which we received. I did that because I care. I also, communicated with John Sykes, the CEO of iHeart Radio and Chairman of the Rock n Roll Hall of Fame about possibly providing music for one of our student events. Again, that's not my job but I did it because I genuinely care and I want to the students to enjoy their academic journey and help FSW succeed. I'm disappointed but how I've been treated.

> Everyone should be treated equally and respectfully.

(*Id.*) Salcedo then followed up with another email to Kailee in the morning:

> From: Altagracia Salcedo
> Sent: Thursday, September 7, 2023 5:42 AM
> To: Kailee Mateika
> Cc: Jason Dudley; Ian Neuhard
> Subject: Re: Tomorrow's Meeting
>
> Kailee,
>
> I'm disappointed that you chose to make accusations that have no merit, and insult me instead of asking questions and having a conversation with me. I feel uncomfortable with the alarming direction that you took my concerns and inquiries in. Maintaining respectful and constructive communication is crucial in business, and I believe it's essential to address this matter.
>
> In your previous message below, you used terms like "not flexible" and "rigid" to describe me, which I find to be untrue, insulting, and unprofessional. It's important to engage in discussions with a focus on the issues at hand rather than resorting to personal attacks and derogatory statements. I have gladly done everything you asked me to do since the transition. I've also reached out to donors and organizations to help students, which is not part of my job. I offered to help FSW Collegiate and IT redesign the websites, which is also not part of my job. Adam and I were the ones who previously reached out to you and asked if we can hold a quarterly meeting with all the FSW marketing people so that we can collaborate. I can provide proof of all of this.
>
> I worked hard and tirelessly to help colleagues in Enrollment Services before the change. I've never asked a team member in Marketing to undo a job that you instructed them to complete because that would undermine their work and your direction. Tiffany Quinn is a coordinator. She is not my supervisor, so it was inappropriate for her to insist that I undo my job that you directed me to complete in front of my colleagues last week. When you asked me to change the direction so that Tiffany

can do what she wants on Tuesday, I complied immediately.

I gave everyone on the Marketing Team access to the survey questions weeks ago (screenshots below) and encouraged them to create their own QR codes if they wanted to. Everyone has access to Qualtrics. I have always offered to help the team any way that I can and collaborate well with colleagues.

I would like you to provide proof, not just statements, of when/where I have been inflexible or rigid because I have proof that there's no truth to that disturbing claim.

Tiffany has spoken negatively about people's jobs and has spoken down to me and over me on more than one occasion. Talking badly about people openly in meetings creates a toxic work environment. She lacks experience when it comes to soft skills and active listening. If you had actually taken the time to speak with me instead of insulting me, I would have told you that you should help her develop those skills so she can be successful. I believe in helping people get up instead of kicking them down.

Attached are screenshots of the comments that were made about the Naples School Board and Dr. Bernstein. I don't believe either party would appreciate these comments made about them.

You assigned a $40,000+ Campus Tour project for me to manage, which I enjoy managing but can only do so much on my end. The vendor provided a timeline and costs in the contract so it is essential to move forward. I don't believe in doing things last minute if we can methodically plan ahead. I asked for test shots for one building in July and have not seen any and it's September. I created a tentative shot list which Eric lashed out at me for, even though it was a tentative shot list. It's clear that I'm not allowed to ask team members for these deliverables so I asked you to approve a soft deadline so everyone is on the same page. This is an expensive project that tax payers probably paid for so I like to be mindful of how I'm spending someone else's money.

> It's sad that you are refusing to provide timelines/deadlines to me but have no problem providing them to the other team members. I need those to be successful, efficient, and manage my time. I don't believe it's unreasonable to ask for clarity in writing so that there is no misunderstanding, since you're the only person who knows what everyone is working on and things change on a whim in Marketing.
>
> Since you refuse to provide those deadlines in an email, I cc'd Jason and Dr. Neuhard for help in getting those deadlines and approvals in an email, especially for Campus Tour (see attached.) It is clear to me that people of color are not treated fairly at FSW because if we were, you would not feel empowered to insult me the way you did.

(*Id.*) Perhaps unsurprisingly, Salcedo's decision to escalate her grievances directly to the college president caught the administration's attention. FSW's General Counsel and head of human resources stepped in:

> From: Susan C. Bronstein
> Sent: Thursday, September 7, 2023 9:29 AM
> To: Altagracia Salcedo
> Subject: Meeting
>
> Good morning, would you be available to meet with me and the college's General Counsel, Joe Coleman via Zoom this afternoon at 1 p to discuss your recent email to the President's Office?
>
> * * * *
>
> From: Altagracia Salcedo
> Sent: Thu. Sep 7, 2023 at 10:34 AM
> To: Susan C. Bronstein
> Subject: Re: Meeting
>
> Good morning, Susan.
>
> I hope you are well. Is there any issue with my email? If there are any concerns, please specify them in an email response. I kindly decline the proposed Zoom meeting. I am not comfortable participating in a meeting with you or

> General Counsel without legal representation. Should I consider retaining an attorney? While it is not my preference, I am willing to do so if necessary. You have a copy of the email that I sent President Allbritten. It is important that individuals in leadership roles within a public institution remain informed about what is happening on the ground level.
>
> The primary responsibility of HR and the General Counsel at FSW is to safeguard the college's interests, not mine, which was evident in the equity report. Unfortunately, there appears to be a clear pattern of discrimination at FSW, which is unfortunate because there are a lot of good people there.
>
> * * * *
>
> From: Susan C. Bronstein
> Sent: Thursday, September 7, 2023 12:25 PM
> To: Altagracia Salcedo
> Cc: Joe Coleman
> Subject: Re: Meeting
>
> It is regrettable that you have declined the invitation to discuss your employment concerns with the College's Chief Human Resources officer and General Counsel. However, this response is consistent with your pattern of telling fellow employees how to conduct themselves and do their jobs and thereafter claiming you are just looking out for the College's and taxpayer's best interests. It is not lost on the College that you have been fabricating meritless discrimination and retaliation claims for some time. Your specious assertion that you have been the target of discrimination will be met with a vigorous and truthful defense should you choose to bring same. Your passive aggressive communications with and about colleagues and overt insubordination compels the College to terminate your employment effective immediately.

(Doc. 36-11 at 1.)

This lawsuit followed. Salcedo alleges age and race discrimination, and that her firing was retaliation for reporting it. (Doc. 6.)

## II. Legal Standard

Summary judgment is not a substitute for trial. It "is appropriate when a movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025).[1] "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019). "And a fact is material if it may affect the outcome of the case under the applicable substantive law." *Toca v. Debonair Props. LLC*, No. 2:23-CV-303-KCD, 2025 WL 2106674 (M.D. Fla. July 28, 2025). Where there are factual disputes, we must resolve them in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The mechanics are straightforward. "The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

to the record, that there are no genuine issues of material fact to be determined at trial." *Andrews v. Ciccone*, No. 3:23-CV-88-MMH-SJH, 2025 WL 2508878, at *2 (M.D. Fla. Sept. 2, 2025). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995).

## III. Discussion

Salcedo's claims are addressed below. But first some background on the framework applicable to this dispute. Salcedo seeks relief under both Title VII and the Florida Civil Rights Act ("FCRA"). Because the FCRA is modeled on Title VII, the same standards apply to both. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010). A plaintiff can prove discrimination using either direct or circumstantial evidence. Because direct evidence is notoriously scarce, courts rely on a familiar framework to evaluate claims built on circumstantial proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Here is how the Eleventh Circuit breaks it all down:

> As we have explained, the *McDonnell Douglas* framework and the convincing mosaic approach are two paths to the same destination—the ordinary summary judgment standard. One approach is not more forgiving than the other on the final question, which is whether a reasonable jury could infer illegal discrimination. But given the continuing confusion on this issue, we add a little more explanation here.

> In *McDonnell Douglas*, the Supreme Court set out a burden shifting framework designed to draw out the necessary evidence in employment discrimination cases. A plaintiff proceeding under that framework bears an initial burden of establishing a prima facie case of discrimination. Once that initial burden is met, the employer must articulate a legitimate, nondiscriminatory reason for its adverse employment action, and then, finally, the plaintiff must show that the employer's reason is pretext for unlawful discrimination. This final question of pretext merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination. In other words, the pretext prong of McDonnell Douglas is just the ordinary summary judgment standard.
>
> The convincing mosaic approach is—in its entirety—the summary judgment standard. That phrase is a metaphor, not a legal test and not a framework. It is also a helpful reminder that McDonnell Douglas is not the only game in town—a particularly useful point for employees with significant evidence of illegal discrimination who lack the comparator evidence often required to set out a case under McDonnell Douglas.

*McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024).

### 1. Race Discrimination

Salcedo's first and second claims are race discrimination. Because, as mentioned, "[f]ederal case law interpreting Title VII . . . applies to cases arising under the FCRA[,]" the Court considers them jointly. *City of Hollywood v. Hogan*, 986 So. 2d 634, 641 (Fla. Dist. Ct. App. 2008). Both outlaw an employer's discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's [race]." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 346

(2024); Fla. Stat. §760.10. To discriminate means to treat worse. *Muldrow*, 601 U.S. 346.

Salcedo urges the Court to view her evidence as a "convincing mosaic" that, taken as a whole, allows a jury to infer discrimination. (Doc. 36 at 16); *see Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). To survive FSW's summary judgment motion under this theory, she "must present a story, supported by evidence, that would allow a reasonable jury to find that [FSW] engaged in unlawful discrimination." *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 995 (11th Cir. 2025). She can piece that mosaic together with "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022).

Salcedo recounts a story in which she was asked to leave a virtual training session, was the only employee required to submit "HTML code with IT tickets," lost access to a software system, and was fired just 48 hours after complaining about discrimination. (Doc. 36 at 16-17.) She tries to color in this narrative with a handful of more explosive claims. For instance, she alleges that a coworker told her Brito was treated better when she previously held the same position. And a former supervisor warned Salcedo of "sabotage." (*Id.* at

9-10.) She also floats an entirely uncited theory that HR was conspiring to document her every move. (*Id.* at 18.)

But here is the problem: summary judgment runs on admissible evidence, not workplace hearsay. *See Macuba v. Deboer*, 193 F.3d 1316, 1325 (11th Cir. 1999). Salcedo offers no path to admissibility for her ancillary facts. For instance, she does not claim that her co-worker's statements fall under a hearsay exception. And her sweeping claim about HR's documentation plot is unmoored from the evidentiary record. (*See* Doc. 36 at 18.) Stripped of the hearsay and hyperbole, we are left only with the admissible core of her story.

Salcedo insists that these remaining facts prove the college's stated reasons for her treatment are just a pretext for discrimination. But to show pretext, she must expose "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" FSW's story so glaring "that a reasonable factfinder could find them unworthy of credence." *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1305 (11th Cir. 2023). She falls well short of that mark. Take the software access. FSW restricted Salcedo's privileges—along with the privileges of her white coworkers—to comply with federal cybersecurity standards. (Doc. 36-4 at 145-146; Doc. 27-3 at 8.) Salcedo gives us no reason to view that routine security audit as an elaborate, racially motivated lie. Or consider the HTML code issue. FSW explains that it only asked Salcedo for HTML code because IT had to build her a customized

tracking system after she repeatedly complained about their standard ticket-renaming procedure. (Doc. 36-1 at 432; Doc. 27-3 at 3-4.) Nothing in the record suggests that explanation is a cover-up. And, for reasons discussed below, the record does not cast skepticism on FSW's proffered reason for firing her—her "passive aggressi[on]" and "overt insubordination"—because Salcedo's complaints of discrimination in her final emails were sprinkles of objectively unreasonable beliefs among complaints that had nothing to do with her race. *Compare Jefferson v. Sewon Am., Inc.*, 891 F.3d 911 (11th Cir. 2018), *with Decoste v. City of Boynton Beach*, 818 F. Supp. 3d 1360, 1382 (S.D. Fla. 2026) ("[A]n employee's decision to engage in protected activity cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.").

Salcedo has no direct evidence or similarly situated comparators from which the Court can infer a meaningful connection between her race and the alleged discriminatory treatment. And federal courts have rejected claims on records far more troubling than this one. For example, even where a plaintiff was referred to by racial epithet, her employer verbally proclaimed "hiring too many black employees," and four of those Black employees were fired, that still "[fell] short of the evidence needed for a convincing mosaic of circumstantial evidence upon which a reasonable jury could infer intentional discrimination

by a decisionmaker." *Decoste*, 818 F. Supp. 3d at 1373-74. Other examples include:

> *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) (no direct evidence of discrimination, even where supervisor said "[w]e'll burn [the plaintiff's] black ass," because that statement was "too remote" and did "not directly relate[ ] to the subject of [the plaintiff's] termination"); *Morgan*, 750 F. App'x at 788 (no direct evidence of discrimination, even where the named partner of the plaintiff's firm said he did not like "Black people" and "that's why they're in the back of the office," because "these remarks and others like them were unrelated to the decisionmaking process"); *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 888 (11th Cir. 2013) (no direct evidence of discrimination, even where the decisionmaker told the plaintiff she "should go back to the night shift" to "be with her own kind," because "the 'your own kind' statement does not prove race or gender discrimination without inference"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (no direct evidence of discrimination, even where the decisionmaker admitted that she had "a bias against blacks" and that "she found that they were difficult for her to trust or get along with," because those statements "could have been expressing a desire to get past such prejudices" and "the statement does not relate directly to the [challenged employment] decision").

*Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1250 (S.D. Fla. 2022). At bottom, none of the facts Salcedo presents create a genuine dispute over whether FSW's legitimate reasons were a pretext for discrimination. So her claims fail.

**2. Retaliation**

Salcedo's third and fourth claims are for retaliation under Title VII and the FCRA. Like above, the Eleventh Circuit applies the same standards for both. *Patterson v. City of Melbourne*, 669 F. Supp. 3d 1204, 1219 (M.D. Fla. 2023). "To establish a claim of retaliation, [Salcedo] must prove that she engaged in statutorily protected activity, that she suffered an adverse action, and that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). If she can establish that, the burden shifts to FSW to articulate a legitimate, non-discriminatory reason for the retaliation. Salcedo must then show that the reason is merely a pretext and that the real reason was retaliation. *Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1344-45 (11th Cir. 2022)

Title VII and the FCRA make it an unlawful employment practice to retaliate against an employee for reporting discrimination—triggering the opposition clause—or for taking part in an investigation—triggering the participation clause. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). Salcedo maintains she was terminated for reporting the discrimination she encountered. As for such allegations:

> [a]n employee can establish a statutorily protected expression for a retaliation claim under the opposition clause if she demonstrates a good faith, reasonable belief that the employer was engaged in unlawful employment practices; this standard has both a subjective and an

> objective component, which means that a plaintiff must show that he subjectively, in good faith, believed that his employer was engaged in unlawful employment practices and that his belief was objectively reasonable in light of the facts and record presented.

*Schmidt v. Disney Parks, Experiences & Prods., Inc.*, 721 F. Supp. 3d 1314 (M.D. Fla. 2024).

The threshold for proving that an employee engaged in a protected activity by reporting discrimination is undeniably low. But a plaintiff's purely subjective belief that discrimination occurred, without more, is not enough. "The objective reasonableness of her belief is measured by reference to controlling substantive law." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295 (11th Cir. 2016). "The employer's practice, which a plaintiff opposes does not in fact have to be unlawful ... rather, the employee need only have a reasonable belief that the employer's practices are discriminatory." *Danner v. Sumter Cnty. Bd. of Educ.*, No. 7:12-CV-02391-RDP, 2013 WL 754956, at *4 (N.D. Ala. Feb. 26, 2013).

Salcedo notes that her belief of discrimination, which she reported, was not merely based on a single stray remark or general disagreements at work. Instead, according to Salcedo, her "discrimination complaint is . . . a detailed, multi-incident document that names specific actors, specific dates, specific witnesses, and specific conduct that [she] expressly attributed to race and age." (Doc. 36 at 21.) However, to determine whether her belief was objectively

reasonable, the Court looks to the incidents she believes were discriminatory, not the level of detail in her complaint.

Salcedo says she complained of the following:

> being ignored from professional greetings while white colleagues received them; being required to submit HTML code that white colleagues were not required to; being asked to leave a vendor training session at the exact moment essential job functions were about to be demonstrated; having system access revoked to zero while a younger, white Admissions Coordinator was given access; being forced to spend six hours working through conference sessions she had traveled to attend, while Brito and Allen attended those same sessions; and receiving humiliating, demeaning emails copied to supervisors and colleagues in response to inquiries.

(Doc. 36 at 21.) While that is her account of events, satisfying the subjective part of the test, the evidence provides an objective picture that a reasonable person would not interpret as discrimination.

Start with the morning pleasantries. Allen and Brito worked in a separate department, and Salcedo faults them for walking into her office suite without saying hello. (Doc. 36-2 at 2.) That is a textbook example of the ordinary workplace friction that falls safely outside the bounds of an employment discrimination claim. As for the IT tickets, Salcedo provides no evidence of who was required to submit HTML code—only testimony about the difficulty she faced with the procedure. (Doc. 36-1 at 166-173.) Whatever the technical mechanics at play here, a separate department's procedural process

for managing its workflow is far to disconnected from Salcedo's race to support an objectively reasonable belief of discrimination.

The same reasonable person would not infer intentional discrimination from a coworker's remark that she "can jump off at any point" from a Zoom meeting. Nor would they infer discrimination because their employer suddenly becomes stricter about who has access to a federally regulated software system and adjusts their job descriptions accordingly. (Doc. 36-1 at 496.) The same goes for having to log 6 extra hours of work during a conference, or engaging in petty email squabbles with colleagues. These are the ordinary, minor annoyances of office life—not actionable civil rights violations.

Although Salcedo claims that her white coworkers did not share her same experience, she provides no admissible evidence to prove it. The Court cannot find anything in the record to fairly compare her side of the story with that of her colleagues. *See Jimenez*, 146 F.4th at 996 ("A similarly situated comparator typically will have engaged in the same basic conduct (or misconduct); be subject to the same employment policy, guideline, or rule; have the same supervisor(s); or share the plaintiff's employment or disciplinary history.") Certainly, Salcedo's belief that she faced discrimination only needs to be reasonable, not necessarily correct. But we still apply legal standards when evaluating how a reasonable person would perceive it. *See Tipton v. Canadian Imperial Bank of Com.*, 872 F.2d 1491, 1494 (11th Cir. 1989).

The Eleventh Circuit has illustrated what constitutes an objectively reasonable belief of discrimination, and Salcedo's workplace grievances fall on the wrong side of the line. *See Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) ("a racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice . . ., and opposition to such a remark, consequently, is not statutorily protected conduct."); *Laincy v. Chatham Cnty. Bd. of Assessors*, 520 F. App'x 780 (11th Cir. 2013) ("his belief that coworker's allegedly harassing comments constituted unlawful employment practice was not objectively reasonable as coworker's three innocuous comments asking if he was dating anyone were not threatening, humiliating, or offensive and did not interfere with employee's job performance"); *see also Bailey v. DAS N. Am., Inc.*, 473 F. Supp. 3d 1310 (M.D. Ala. 2020) ("while an employer's intent may be difficult to discern, it is not objectively reasonable to presume that, simply because an employee has been subjected to seemingly inexplicable negative treatment, the true reason for the treatment must be unlawful discrimination"); *Stafford v. Duval Cnty. Pub. Schs.*, 720 F. Supp. 3d 1216 (M.D. Fla. 2024) (black employee's complaints about problems with his manager, describing manager withholding information, using a harsh tone or aggressive body language, engaging in unwarranted criticism of employee, and other communication problems with

manager that were allegedly related to employee's race, were not "protected activity" for purposes of Title VII retaliation claim).

Salcedo also has a causation problem. In her view, the 48-hour window between her final emails and her firing provides the temporal proximity a jury needs to infer retaliation. But that timeline works only if her September emails count as protected activity. The Court agrees with FSW on this point—"[m]erely phrase-dropping people of color into a dialogue that makes no connection to race or any unlawful conduct, does not constitute protected activity." (Doc. 39 at 6.) As the record shows, Salcedo's email messages lack any substantive detail about unlawful conduct. Rather than raising new claims of discrimination, they merely rehash prior gripes and refer back to the results of her original April complaint. Because the emails do not constitute new, independent protected activity, Salcedo cannot use them to reset the clock.

Setting aside the September emails, the temporal link disappears completely. A five-month gap between her protected complaint and her termination cannot establish causation on its own. *See Davis v. Collins*, 781 F. Supp. 3d 1258 (M.D. Fla. 2025) (finding that more than two months was not sufficient temporal proximity to show that the protected activity and the adverse action are not wholly unrelated).

In the end, the reason for Salcedo's termination jumps right off the page. When she did not like her supervisor's response, she bypassed the chain of

command and complained directly to the college president. And when FSW tried to schedule a meeting to discuss the issue, she refused to participate. No reasonable jury could look at this record and conclude that FSW fired her in retaliation for an old complaint, rather than for this disruptive and insubordinate behavior.

**3. Age Discrimination**

Salcedo's final claim is age discrimination under the FCRA. Yet she mounts no substantive defense of this count. She simply lumps age and race together, casually appending the word "younger" whenever she mentions her white colleagues. But age and race discrimination are two distinct theories with distinct evidence. "In our adversarial system, a claimant must present her case. It is not a court's job to conduct research to provide the proper support for [conclusory] arguments." *Herman v. Mr. Cooper Grp. Inc.*, No. 2:23-CV-948-JES-KCD, 2024 WL 3277021, at *1 (M.D. Fla. July 2, 2024). This Court has "neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support [Salcedo's age discrimination] claim." *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). In any event, because Salcedo ties her race and age claims together, the latter necessarily fails for the same reasons already explained. *See Chavez v. Sec'y*

*Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[A] district court cannot be expected to do a petitioner's work for him.").

## IV. Conclusion

The record does not contain sufficient evidence for a reasonable jury to find in Salcedo's favor. Her claims of race discrimination, retaliation, and age discrimination thus fail. Accordingly, FSW's Motion for Summary Judgment (Doc. 28) is **GRANTED** and Salcedo's complaint is **DISMISSED**. The Clerk is directed to enter judgment in FSW's favor, terminate all deadlines, and close the case.

**ORDERED** in Fort Myers, Florida on September 4, 2026.

Kyle C. Dudek
United States District Judge